Our final case for argument today is 24-1134 Sheffield v. Secretary of the Army. Mr. Wilson, please proceed. Thank you, Your Honors. May it please the Court. While this case contains many procurement issues in it, and it contains not only an affirmative claim that Sheffield Korte Joint Venture has made, it also includes an appeal from the decision that the Corps of Engineers is entitled to reimbursement, I'm going to focus primarily, though, on the procurement issue involving what I think is the spear and doctrine applicable to this case. In 1918, the typical procurement method was design, bid, build, meaning there was usually a complete set of four construction drawings and specifications, and when the government did that, if there were errors in those plans and specifications, and the contractor relied on those plans and specifications and ended up incurring additional costs, the contractor would recover the additional costs, usually as an equitable adjustment. Today's world is different, and frequently different federal agencies, including the Corps of Engineers, use design, build. Well, how do you think that we should determine whether something is a performance specification or a design specification? Well, I'm going to step back for a second and say I understand that's the typical analysis that you see in many of this Court's decisions, but I'm not sure one of the decisions indicated that we don't have to rely on the labels of performance versus design. The real key, I think, is, and quoting Robbins' maintenance versus United States, whenever the government uses specifications in a contract, there's an accompanying implied warranty that these specifications are free from errors. In fact, the test for recovery based on inaccurate specifications is whether the contractor was misled by these errors in the specifications. There has been distinctions identified in case law by this Court as to what is performance. Typically, it's a more general, here's the end result we want as the government, and we don't tell you how to do it, contractor. You design it, you build it. This case is a little different, and frankly, I think it asks you to look behind the rationale of the sphere and doctrine. The rationale, again, is if there's something furnished to a contractor that the contractor reasonably relies upon to its detriment and is misled, it's in the plans and specifications, I think there should be recovery based on an equitable adjustment or a change. In this case, we'll just assume for the moment that when I look through the statement of work provisions, it really seems to contemplate that the contractor, the winning bidder, has a lot of design freedom and talks about what's being provided to the contractor is a conceptual design and how the winning contractor will then complete that design. And in completing that design, the burden is on the contractor to conform with all applicable criteria and codes. And if that's the way I understand the statement of work, then it would sound like what we have here are performance specifications and not design specifications. And if you could point me to something that dislodges that current view of the statement of work, I think that would be helpful. Actually, Your Honor, I'd agree with everything you said except the conclusion from that. I don't think it's necessarily a performance specification. And what I would point to is, and it's not mentioned in the board's opinion, it's not mentioned in the contracting office final decision. And it's two sections, 1.2.4.1, which says this conceptual design is accepted by the government. That's Appendix 1831. And then 1.5, the conceptual drawings are included as part of this RFP to provide information and criteria for the contractor's completion of the design. I read that, and my client read this, as here's a design you should take, the fundamental aspects of the conceptual design. And the prominent features that stood out in drawing C-101 were three buildings, a parking lot, a fenced-in area. This went from a 16.5-approximate acre to a 15-acre site. But also prominent was a note and a configuration of what was a retention bond. Why shouldn't the term conceptual design and conceptual drawings be understood as, we, the government, have this very high-level concept idea of what we want. And now, per these provisions, it's up to the contractor to complete the design, again, in conformance with all applicable criteria and codes. So, yes, the government is accepting this high-level concept plan, but when it comes to the conception of implementation, that's going to be on the contractor. And I agree that we should have been able to complete the design based on that concept. We could not complete the design based on that concept. The concept they had was a centralized stormwater system in one area. It could have been changed in the design builders, in my client's design. They could change where that was located, but it was centralized. It was going to be a retention bond. Counsel, where, if anywhere, does it say in the specification or contract that the stormwater management system had to be a centralized design? Can you point me to a specific record site? Your Honor, it does not say centralized design. It's the configuration in the drawing, in C-101, which shows where the stormwater facility, singular phrase, not stormwater improvements, stormwater facility. And that is read by my design builder client as we're going to have a major feature, a retention pond. You'll provide swales to lead to it, maybe some piping. But you're not going to have 19 devices spread throughout the project site. And so we call it decentralized and centralized because that's the terminology that the Maryland Department of Environment uses. This is after-the-fact terminology. It does not say that in the specifications or plans. But the depiction is not consistent with spreading out the stormwater devices throughout the site, which is a much more expensive design and construction. And again, I will say there are quotes from this court in different Speran cases that seem stronger against our client's position. But there are also quotes that I think look at the underlying rationale, which is if this misleads the contractor in terms of a plan or specification, the contractor should recover. For example, Franklin-Pavlov construction, which we quote in our brief. Under the Speran doctrine, when the government provides a contractor with defective specifications, the government is deemed to have breached the implied warranty that satisfactory contract performance will result from adherence to the specifications and the contractor is entitled to recover costs approximately. What about 1.2.4.3, which reads, quote, the conceptual design illustrates desired general arrangements, orientation, and adjacencies and provides examples of exterior images, which is acceptable to the government. It is not intended to dictate the final layout and image for the project. The contractor's designer shall develop and refine the conceptual site and building design in their completion of the design and construction documents. Such development shall be consistent with the criteria and acceptability of government. So the fact that they may have drawn out a sketch with a pond, I don't know if that necessarily indicates based on all these provisions that they had a very hard, rigid, specific demand of a centralized arrangement. I don't think they did have a hard, rigid demand that it had to be a certain size. It had to be a certain depth. They didn't even say what the depth of the retention pond should be. They don't say how the flow of the water from the rest of the site, but typically you would grade it so that the water would end up either in a swale or at least have the grading so the water would end up in the retention pond. But what it does say is that we have a, quote, stormwater facility, singular, and it's going to be somewhere. Now, it can be moved. It can be a little different size. That will be the contractor's decision, but it doesn't say what we're looking for is diffusing the stormwater facilities, the devices, infiltration devices, subterranean devices that will deal with the stormwater all throughout the site. It doesn't say that. So I think that it's a matter of in terms of specifying by this drawing and by the other information in the plans and specs which identify what that meant, including the geotechnical engineer who read the drawings. It was put in the specifications for design builders to bid on. All of that identified a system that would be generally to the north or northwest and have primarily relied on a retention basin. I think it's important. Is your argument that the board constructively changed the contract dependent on us concluding that the Spearman Doctrine applies in this case? It's my view, Your Honor, that the board did not consider two of the key provisions in the contract and didn't try to reconcile them with the rest of the contract documents. It did not deal with 1.5. It did not deal with 1.4.1. There's no mention of it. The contracting officer's final decision doesn't mention those sections at all. What about 3.4.5? What do we do about that? That's the one that says that the contractor has to comply with the federal, state, and local laws and goes further and it says decentralized systems can be used. What about that? I'm sorry. 3.4.5. So I think 3.4.5 dovetails with the Permits and Responsibilities Clause. That's correct. Yes, absolutely. But that's all on the contractor to sort out. Why doesn't that lend further weight to some of the other sections Judge Chen was pointing to, like 1.2.42, 1.2.43, all of which seem to be giving design permission to the contractor and not forcing strict compliance with a particular design? So, Judge, let me back up a second. We're dealing with three phases, solicitation phase, design phase, construction phase. The last two are obviously after the award. What does a design builder do when they receive a solicitation that says, here's the concept drawing that you can complete? And the other language in some of the sections… No, it doesn't say you can complete. It says we would find it acceptable. We would find it acceptable, but it also said, but you, contractor, have to make sure you're in compliance with all these other regulations and local laws. I think we cite, Your Honor, in the other sections in that same part that do say complete the design. They use the words develop and refine, and develop and refine, to me, is complete based on the conceptual design. But going back to your question… But you think if it says develop and refine, that means that it absolutely has to do everything that's in the picture. You only have the ability to, you know, add a tutu? I mean, what's the deal there? Like, I don't understand. Develop and design, that seems to give you permission to move some of those buildings around, for example. No? We have permission. We can't come up with another building or eliminate one of the buildings, so we do have to comply with that conceptual design to its largest features. And therefore, there is some flexibility in terms of size, in terms of, in the case of stormwater, depth. It even could be moved along the northern edge, which would make sense because the slope… And doesn't the conceptual drawing actually tell you you have to determine the actual size and location? It does say in the parenthetical expression on the note that it is our decision on where that should be. But it doesn't say it's going to be a different kind of stormwater system. Okay. That's our point. Well, we better save some time for rebuttal. We better let the government go ahead and have a chance. Thank you. Good morning, Your Honor, and may it please the Court. The Court should reject the contractor's attempt here to shift the entirety of its risk for compliance with the Permits and Responsibilities Clause from the contractor to the government. That would be in contravention of this Court's precedent in cases such as Belhiri, where the Court has held that the entirety of the risk under the Permits and Responsibilities Clause at FAR 52-236-7 is on the contractor. Is it pretty standard now for the federal government to have this Permits and Responsibilities Clause in all of its construction contracts? I believe… Just shift all the risk. You know, who knows what problems may come around the corner. We don't have to worry about it. It's completely on the contractor. As a standard clause in the Federal Acquisition Regulation, I believe the government does routinely include that clause in federal government contracts. This Court in Belhiri did recognize that the government can circumscribe its risk and the contractor's risk under that clause by also including any contract-specific limitations on the extent to which the contractor needs to engage with local authorities, obtain permits, and comply with them. There's no allegation in this case that there was such a specific limitation on the contractor's risk. Would you say that all design-build contracts the federal government enters into are just performance specifications and not design specifications? No. There are certainly design specifications in construction government contracts requiring design and construction, and this Court's precedent in Blake Construction recognizes that in one contract you may have both performance and design specifications. But in this case, as a condition precedent lacking for application of the Spirin Doctrine, which is what the contractor's claim relies upon, there is no design specification. In other words, as Spirin said at 248 U.S. at 136, Spirin Doctrine requires, quote, the contractor is bound to build according to plans and specifications prepared by the government. Here, there is no binding specification on where this stormwater management system shall be located within the site layout. This Court has interpreted that direction. Counsel? Yes. How should we interpret that contract provision saying the conceptual design is accepted by the government? Counsel makes a lot of that sort of language. Can you give your response to that? Yes, Your Honor. Your Honor, simply because the government has found the conceptual layout to be acceptable to it is not a warranty that the local permitting authorities, again, compliance with their requirements is wholly on the contractor, bears the risk for that, that the local permitting authorities would find that same layout to be acceptable for purposes of their review. In the reply brief, the appellant even recognizes that page 10, for example, that the SKJV, the Sheffield and Cordy Joint Venture Design Team, had the contractual obligation to and was committed to, quote, roll up their collective sleeves to refine and complete the design in a manner that complies with not only the U.S. Army Corps' provided plans and specifications, but also the federal, state, and local laws and codes. So during performance, it was not sufficient that the government found the layout to be acceptable, but rather the local permitting authorities also needed to find that layout acceptable, and the contractor here bore the risk of the local authorities not finding that layout acceptable. In any event, the government's acceptance of that layout is qualified throughout the specifications, particularly as Judge Chen and Judge Moore, I believe as well, were speaking at Appendix 1831. There are multiple qualifications regarding the purpose for that conceptual design, in that the contractor had to refine it during design and permitting process. There was no representation by the government that that conceptual design would be sufficient for ultimate design approval by the local permitting authorities, and again, the risk was on the contractor to obtain that permission. What if the contract said, we the government, we want a centralized stormwater system, and then it turns out that the local state authorities demand that it be decentralized? Then what happens? Would the Sperm Warranty apply there? Reading the limitation that this court understood in Belheiri, that there is a, quote, specific limitation on the contractor's obligation to obtain permits or comply with local permitting authorities, if the court were to find that such a direction were a specific limitation on the extent to which the contractor, nonetheless, needed to engage with local permitting authorities and comply with local permitting requirements, then perhaps there could be a Sperm Warranty in that, or at least a defective specification theory that could lead to recovery in the situation Your Honor postulates. But in this case, that situation... Right, but I want to know your thoughts on whether the Sperm Doctrine would apply when the government has a specific instruction that says, we want the centralized stormwater drainage system, and the local authorities... There's still a PNR clause in the contract, and it's quite clear that the local county is not going to move. It has to be decentralized in their view. I believe in the situation, Your Honor, for it to be a clear case of government, or a clear case of contractor entitlement to an equitable adjustment, there would need to be a specific limitation per Belheiri on the contractor's obligations under the PNR clause. And to have that in the situation Your Honor postulates, we would need to have language from the government in the solicitation saying that, essentially, regardless of what the local permitting authorities require, I, federal government, require you to have a centralized... Isn't that interesting, though, that the government would make a certain demand that's baked into the contract that's deemed illegal by some local authority, and now the contractors caught the twixt in between there. No, it's not odd, because this was federal land, and the federal government had, I believe, the ability, per federalism, not to be subject to the local regulations and requirements, but rather the government, as a good neighbor, the federal government chooses, as she says, chooses as discretion to have its project subject to local permitting requirements. For example, it is in the government's interest to do so, because later down the road of conveyance of the property were to be in the government's interest, to have a permitting-compliant land would enable, potentially, that conveyance. Your Honor, I believe we have covered most of the points discussed by Mr. Wilson. Does the recoupment issue stand or fall on the same questions we've already been discussing, which are basically, is this a performance contract or a design contract? Yes, Your Honor. In reply, as we pointed in our response brief, the appellant agrees that the recoupment claim rises or falls with the success of its sphere and warranty claim, such that given the lack of the design specification as a condition precedent to sphere and applying, the recoupment claim fails like, the recoupment, the challenge to the recoupment claim fails. The government's recoupment claim stands, but the affirmative claim by the contractor should be denied as the board found and the court should affirm the board's decision. If there are no further questions, thank you.  Thank you. Your Honors, I'm going to just briefly mention Hill's materials, because I think that case was triggered by the questions that were just asked and just at the end of my presentation. Hill's materials did allow the contract provision to specifically control over the permits and responsibilities clause. In that case, the accident prevention clause constructed the contractor to deal with the OSHA standards that had been issued, that was past tense, and new standards were applied and the government said, well, you've got to follow those under the permits and responsibilities clause, and the contractor recovered an equitable adjustment. In that case, the court did say, while compliance with the subsequent changes would not be excused, just like we wouldn't be excused once the state imposed their requirements, it could entail additional compensation. And so we believe, if we step back and look at what happens in the design-build scenario, we have a solicitation that tells us, among other things, that we're going to have a retention pond and a more centralized stormwater system. We're bidding. Michael Baker, Inc., is the designer for the Corps, a very reputable firm. There's no reason for us to question that, and it tells us we should be able to rely on that. And so I believe the language in the specifications that talks about the conceptual design being acceptable and the language, I think, can be read to mean completed per the design with some flexibility but not make a major change like this creates liability. Thank you. Okay, thank you. I have one question. Please don't sit. Oh, can I come in? Okay. And I'm just following up on a question I asked you before to make sure I have the answer on it. You continue that the board constructively changed the contract. I'll break the question down into two parts. Is that part of your argument? I'm claiming that the board ignored two key provisions. So does that mean you're not continuing that there was a constructive change in the contract? Just yes or no? Just tell me one way or the other. I wouldn't fit it that way, but I'd say yes. You said yes? Is that what you just said? Yes, because they did not consider two key components of the contract. Okay. Thank you. I have no further questions. Thank you. Thank both counsel. The case is taken under submission.